UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
                                                                               :

PARTECH, INC.,                                        :

                                         :

                          Plaintiff,           :              24-CV-9381 (JAV)

                                         :

              -v-                         :           <u>OPINION AND ORDER</u>

                                         :

MICHAEL JACKSON and QU POS, INC.,         :

                                         :

                         Defendants.       :
------------------------------------------------------------------X

JEANNETTE A. VARGAS, United States District Judge:

      ParTech, Inc. ("PAR" or "Plaintiff"), a New York corporation that offers point-of-sale solutions to restaurant enterprises, alleges that Defendants misappropriated its trade secrets and proprietary information. Plaintiff filed an application for injunctive relief pursuant to Federal Rule of Civil Procedure 65. For the reasons stated below, the application is denied.

## BACKGROUND

### A.    Factual Allegations

      PAR is a New York corporation with headquarters in New York that offers an array of software and hardware solutions — encompassing point-of-sale, digital ordering, back-office management, loyalty, and payments — for clients in the hospitality and retail industries. ECF No. 1-1, Ex. A ("Compl."), ¶¶ 4, 10. Defendant Michael Jackson, a Texas resident, is a former employee of PAR, where he served as a Director of Product Management between June 2022 and November 2024. *Id.* ¶¶ 5, 14, 29. Jackson signed an Offer of Employment letter from PAR on

May 29, 2022.  *Id.* ¶ 15.  As part of his employment, Jackson also signed a Non-Disclosure and Non-Solicitation Agreement, Compl., Ex. 1 (the "NDA"), which prohibited Jackson from sharing "PAR's trade secrets and other non-public information that PAR treats as confidential, proprietary, or private in nature" outside of PAR, even after his employment by PAR was terminated.  Compl., ¶¶ 15, 17-20; NDA § 2.  As Director of Product Management, Jackson had access to confidential and proprietary information belonging to PAR, such as marketing, pricing, and sales strategies; product roadmaps; financial performance markers; and product development plans.  Compl., ¶ 21; ECF No. 29 ("Ostertag Affirm."), ¶ 10.

Jackson performed his position at PAR on a fully remote basis from Texas, as his Offer of Employment specified, and none of his direct reports or team members resided in New York.  Compl., Ex. 1, Offer of Employment Letter § 4; ECF No. 39, Ex. A ("Jackson Dep.") at 13:1-14:6.  Jackson never traveled to New York or visited PAR's New York office, even when initially interviewing for the position.  ECF No. 34 ("Jackson Decl.") ¶¶ 3, 6(d); Jackson Dep. at 18:3-23.  While working at PAR, Jackson did not knowingly work with customers who were located or headquartered in New York.  Jackson Decl., ¶ 6(f); Jackson Dep. at 72:16-73:18.  Although he traveled out of state to meet with several customers, his business travels never included New York.  Jackson Decl., ¶ 6(f).

On May 15, 2023, Jackson received 305 Restricted Stock Units ("RSUs") under PAR's Equity Incentive Plan.  Compl., ¶ 22; *id.* Ex. 2 ("RSU Award

Agreement"). Pursuant to the terms of the plan and agreement concerning his RSU award, the first one-third of Jackson's RSUs vested on June 1, 2024. *Id.* ¶¶ 23-24. According to the terms of the RSU award agreement he signed, Jackson acknowledged that if he "engage[d] in Injurious Conduct," he may be required to return or pay the proceeds of any shares acquired on settlement of the RSUs. *Id.* ¶ 26. Jackson's May 29, 2022 Offer Letter defines "Injurious Conduct" as including "the unauthorized use or disclosure of any trade secret or confidential information of the Company (or of any client, customer, supplier, or other third party who has a business relationship with the Company) or the violation of any non-competition, non-disparagement or non-solicitation covenant or assignment of inventions obligation with the company." *Id.* ¶ 27; *id.* Ex. 1 ("Offer Letter"), § 6(a).

Jackson gave notice of his intent to leave PAR on November 1, 2024, and his final day as Plaintiff's employee was on November 15, 2024. Compl., ¶¶ 28-29. Shortly afterwards, Plaintiff learned that Jackson had started employment with Defendant Qu POS, Inc ("Qu") as a senior director of product management. *Id.* ¶ 30; Jackson Dep. at 70:23-25. Jackson became an employee of Qu on November 18, 2024, where he continued to work remotely from Texas. Jackson Decl., ¶ 8.

Qu, a Delaware corporation with headquarters in Virginia, directly competes with PAR, as it is also a provider of point-of-sale solutions for enterprise customers in the restaurant industry. Compl., ¶ 6; *see also* Ostertag Affirm., ¶¶ 3-6. Plaintiff alleges that the two companies, at their core, sell the same point-of-sale architecture to their potential customers. Ostertag Affirm., ¶ 5. Notably, point-of-

sale is the most "strategically important product" for these companies to offer because it is "the lynchpin of a restaurant's technology tech stack and a highly viable cross-sell driver for software providers." *Id.* Both PAR and Qu target and compete for the same customer pool of approximately 500 large enterprise restaurant concepts in North America. *Id.* ¶ 6. Plaintiff argues that each additional customer is hard-earned; significant time and resources must be invested to learn about the customer and tailor the software solution towards it. *Id.* ¶ 7. Thus, according to Plaintiff, Defendants' use of PAR's trade secrets and confidential information could enable Qu to damage PAR's reputation and steal PAR's current and prospective customers. *Id.* ¶¶ 7-8.

Upon Jackson's departure from PAR, Plaintiff investigated and discovered that Jackson had "downloaded a number of highly sensitive documents to his personal devices" as well as created a "full backup of his PAR provided laptop" that contained PAR's proprietary and confidential information. Compl., ¶¶ 31-32. Plaintiff alleges that the information "includes PAR's most sensitive and confidential information" that details its future strategies and plans, its competitive positioning, and key calculations. Ostertag Affirm., ¶ 9. Plaintiff claims that this kind of information is expensive to develop and tremendously valuable to a competitor seeking to gain insight into PAR's internal workings, potential strategies, and market positioning. ECF No. 9 ("Plf. Mem.") at 7; Ostertag Affirm., ¶¶ 13-15, 17.

4

On December 4, 2024, Plaintiff wrote to Jackson, copying Qu's CEO and notifying Jackson of its concern that Jackson may have taken PAR's confidential and proprietary information in breach of the agreements he signed. ECF No. 15 ("Defs. Obj.") at 2. Upon learning of Plaintiff's concerns, Qu states that it immediately placed Jackson on administrative leave and terminated his access to Qu's systems and devices. *Id.* Qu informed Plaintiff of the actions it had taken and noted that Jackson possessed two external hard drives holding PAR documents, which Jackson had agreed to relinquish to a forensic vendor — along with his personal and work laptops — for preservation and analysis. *Id.*

## B. Procedural History

On December 6, 2024, Plaintiff filed a Complaint in the Supreme Court in the State of New York, asserting claims for breach of contract, tortious interference with contractual relationship, misappropriation of trade secrets, violation of the Economic Espionage Act, 18 U.S.C. § 1832, unfair competition, and unjust enrichment. Compl., ¶¶ 1, 5. Defendants removed the action to federal court on December 10, 2024, pursuant to 28 U.S.C. § 1441, on the grounds that the cause of action under the Economic Espionage Act raised a federal question and that the action in its entirety fell within the Court's diversity jurisdiction. ECF No. 1, ¶ 4.

That same day, Plaintiff submitted to the Court an application for an Order to Show Cause for a Temporary Restraining Order and Preliminary Injunction pursuant to Rule 65. ECF No. 8 (the "Application"). The Application sought a preliminary injunction preventing Defendants from "(i) using or disclosing any of

PAR's confidential information and trade secrets during the pendency of this Action; (ii) compelling Defendants to certify in writing the identities of all persons or entities to whom PAR's information was sent or communicated; (iii) compelling defendants to permit PAR to inspect the devices that were used to download and/or store PAR's confidential information and trade secrets; [and] (iv) compelling defendants to submit to a forensic inspection, to be conducted by a third party under the supervision of PAR, of their respective devices and systems to determine whether they contain PAR's confidential information and trade secrets." *Id.* at 1-2. The Application further sought a temporary restraining order ("TRO") against Defendant Jackson, ordering him to "(a) refrain from using or disclosing any of PAR's confidential information and trade secrets during the pendency of this Action; (b) altering, deleting, disposing of, or giving away any of the information taken from PAR or the devices used to take information from PAR; (c) communicating with employees of Qu; (d) communicating with current, former, or potential customers of PAR; and (e) taking any action that might result in the dissemination or disclosure of PAR information to any third party." *Id.* at 2. The Application sought a similar TRO against Qu. *Id.* at 2-3.

The Court granted Plaintiff's Application for a Temporary Restraining Order in part and set a Show Cause Hearing with respect to the remaining aspects of the TRO application and the motion for a preliminary injunction. ECF No. 14. Defendants submitted a memorandum of law in opposition to Plaintiff's Application,

arguing that the Court lacked personal jurisdiction over the Defendants and that there was no basis for emergency relief. Defs. Obj. at 3.

On December 11, 2024, the Court held an initial Show Cause Hearing with respect to Plaintiff's Application. At the hearing, the parties both indicated that an adjournment to permit the parties to pursue settlement discussions might be fruitful. The Court therefore continued the hearing until December 23, 2024, and ordered that the TRO remain in effect until the date of the hearing. At the unopposed request of Defendants, ECF No. 20, the hearing was again adjourned until January 13, 2025. ECF No. 35 ("PI Hearing Tr.").

At the hearing held on January 13, 2025, the Court heard argument on the pending Application. After the Court raised concerns at the hearing regarding the sufficiency of the evidentiary record regarding personal jurisdiction and irreparable harm, the parties were provided the opportunity to file supplemental evidentiary submissions and briefing. The parties were also permitted to take depositions of witnesses limited to the issue of personal jurisdiction. Plaintiff conducted a two-hour deposition of Defendant Jackson on January 17, 2025. That same day, the Court granted the parties the opportunity to each submit relevant excerpts from the deposition transcript, as well as a two-page letter discussing how Jackson's deposition testimony bears on the issue of personal jurisdiction. ECF No. 38. The parties informed the Court that they did not intend to offer live testimony were the hearing to be continued, ECF No. 37 at 1, and the Court therefore closed the record, ECF No. 38.

After reviewing the Complaint and all exhibits attached thereto, the Application, the declarations submitted in support of the Application and all exhibits attached thereto, Defendants' opposition brief, the Declaration of Defendant Jackson, the deposition testimony of Defendant Jackson, and the supplemental submissions by both parties, the Court now addresses Plaintiff's Application for Preliminary Injunction.

## DISCUSSION

Plaintiff argues that it will suffer irreparable harm without injunctive relief because Jackson is currently employed by Plaintiff's direct competitor and possesses several of Plaintiff's trade secrets and highly confidential documents. ECF No. 9 ("Plf. Mem.") at 3-4; *see also* Ostertag Affirm., ¶¶ 9-10. Furthermore, Plaintiff contends that the information in Jackson's possession would give an immediate advantage to Plaintiff's competitors and potentially cause Plaintiff to lose a customer "for a decade or more." Plf. Mem. at 4.

Defendants not only challenge Plaintiff's assertions of immediate, irreparable harm, but also maintain that the Court does not have personal jurisdiction over them. Defs. Obj. at 3; *see also* ECF No. 34 ("Defs. Suppl. Br.") at 1-6. The "'cardinal principle that the district court is "powerless to proceed" in the absence of personal jurisdiction applies with no less force when the court is presented with a motion for a preliminary injunction.'" *Pablo Star Ltd. v. Welsh Gov't*, 170 F. Supp. 3d 597, 611 (S.D.N.Y. 2016) (quoting *Khatib v. Alliance Bankshares Corp.* 846 F. Supp. 2d 18, 24 (D.D.C. 2012)). In order to obtain a preliminary injunction, the movant must

demonstrate "'a reasonable probability of ultimate success' on the issue of personal jurisdiction." *NewLead Holdings Ltd. v. Ironridge Global IV Ltd.*, No. 14-CV-3945 (WHP), 2014 WL 2619588, at *3 (S.D.N.Y. June 11, 2014) (quoting *Weitzman v. Stein*, 897 F.2d 653, 659 (2d Cir. 1990)); *see also Alibaba Grp. Holding Ltd. v. Alibabacoin Found.*, No. 18-CV-2897 (JPO), 2018 WL 2022626, at *2 (S.D.N.Y. Apr. 30, 2018) (internal citation and quotation marks omitted). Thus, before assessing Plaintiff's entitlement to injunctive relief, the Court will address the threshold question of whether it can exercise personal jurisdiction over either Defendant.

## A. Personal Jurisdiction

"A district court sitting in diversity applies the forum state's law to determine whether it has personal jurisdiction over a defendant." *Bohn v. Bartels*, 620 F. Supp. 2d 418, 424 (S.D.N.Y. 2007). Accordingly, the Court must first apply New York's long-arm statute, codified at N.Y. C.P.L.R. ("CPLR") section 302, to determine whether personal jurisdiction exists over the non-domiciliary Defendants, and then further confirm whether the exercise of jurisdiction comports with the Due Process Clause of the United States Constitution. *Spin Master Ltd. v. 158*, 463 F. Supp. 3d 348, 362 (S.D.N.Y. 2020); *see also Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 169 (2d Cir. 2010). Plaintiff argues that this Court has personal jurisdiction over Jackson under CPLR section 302(a)(1), and over both Defendants Jackson and Qu pursuant to section 302(a)(3). Compl., ¶ 7. Based on the current record, the Court concludes that Plaintiff has failed to carry its burden

of establishing a reasonable probability of success on the issue of personal jurisdiction as to either Defendant.

### 1.    CPLR Section 302(a)(1)

Section 302(a)(1) provides that personal jurisdiction exists over a non-domiciliary defendant that "transacts any business within the state or contracts anywhere to supply goods or services in the state." This inquiry focuses on whether the defendant engaged in "purposeful activity — some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 246 (2d Cir. 2007). Courts consider several factors when determining whether a defendant has "transacted business" within the meaning of section 302(a)(1), including:

> (i) whether the defendant has an ongoing contractual relationship with a New York corporation; (ii) whether the contract was negotiated or executed in New York and whether, after executing a contract with a New York business, the defendant has visited New York for the purpose of meeting with parties to the contract regarding the relationship; (iii) what the choice-of-law clause is in any such contract; and (iv) whether the contract requires franchisees to send notices and payments into the forum state or subjects them to supervision by the corporation in the forum state.

*Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 22-23 (2d Cir. 2004) (quoting *Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp.*, 98 F.3d 25, 29 (2d Cir. 1996)). No single factor is dispositive, and the Court's "ultimate determination is based on the totality of the circumstances." *Agency Rent A Car Sys.*, 98 F.3d at 29.

Applying this test to Jackson, the Court concludes that Jackson has not purposely availed himself of the privileges of conducting activities within New York

sufficient to subject him to personal jurisdiction under section 302(a)(1).  Although
Plaintiff was a former employee of PAR, a New York corporation, that was the
extent of his ties with the forum state.  Jackson performed his position on a fully
remote basis from Texas, where he lived.  Jackson Decl., ¶ 6(a).  Jackson never
traveled to New York or visited PAR's New York office, even when he interviewed
with PAR for his position.  *Id.* ¶¶ 3, 6(d).  Indeed, he negotiated his employment
contract with PAR employees located in Maryland and California.  *Id.* ¶ 2; Jackson
Dep. at 16:10-21.  And his employment agreement with PAR stated that it would be
"governed, construed, and interpreted in accordance with the laws of the State of
Texas."  Offer Letter, § 6(f).

Jackson's immediate supervisor resided in California, as did his second line
supervisor.  Jackson Decl., ¶ 6.  The next individual in his reporting chain resided
in Chicago.  *Id.*  None of his direct reports were based in New York, but were
instead located in Texas, Canada, and California.  Jackson Decl., ¶ 6(c).  Similarly,
none of the members of the product management team with whom he worked lived
in New York.  Jackson Dep. at 13:1-14:6.  Jackson did not even speak directly with
PAR employees based in New York, other than on two or three occasions.  Jackson
Decl. ¶ 6(e); *see also* Jackson Dep. at 54:11-55:14.

Moreover, Jackson testified that to his knowledge he did not communicate or
work with customers who were located or headquartered in New York.  Jackson
Decl., ¶ 6(f).  Rather, the clients he worked with were headquartered in Texas,
Georgia, California, Minnesota, and Wisconsin.  *Id.*  While some of the PAR

customers Jackson met with might have retail locations in New York, Jackson Dep. at 21:17-21, 46:2-19, these customers are chains that have retail locations spread throughout the country. Jackson did not meet any of these customers in New York. Jackson Decl., ¶ 6(f). Thus, despite formerly working for a New York company, Jackson's PAR contacts in New York are, at the very least, attenuated.

Notably, courts that have exercised personal jurisdiction over out-of-state employees of New York companies typically have done so only after finding a more substantial relationship between the employee and the business operations in New York. For example, in *LeCroy Corp. v. Hallberg*, the Court found that the defendant "exchanged emails with over 80 different employees in [his employer's] New York headquarters," and "worked with . . . marketing people at [the New York headquarters] to produce online promotional material." 09-CV-8767 (PKC), 2010 WL 3958761, at *3 (S.D.N.Y. Oct. 4, 2010). The defendant in that case also "regularly interacted" with the CEO of the company in New York, "typically sen[t] documents and other communications to [the CEO] via e-mail," "conducted conference calls and video conferences" with the CEO, and regularly received directives from the CEO. *Id.*

Similarly, in *Mercator Risk Services, Inc. v. Girden*, the Court found it had personal jurisdiction over five former employees of a New York company who worked outside the state, because the execution of their employment contracts, non-solicitation agreements and stock awards involved interaction with the company's New York headquarters; the employees made frequent business-related trips to

New York; at least one employee supervised individuals in the New York office; and the confidential information that the plaintiffs were alleged to have stolen was taken from computer servers in New York.  No. 08-CV-10795 (BSJ), 2008 WL 5429886,  at *3 (S.D.N.Y. Dec. 30, 2008).  The facts in *LeCroy Corp.* and *Mercator* stand in contrast to the limited record put forth by Plaintiff in the present matter. No evidence has been put forth, beyond the bare fact of Jackson's employment by a New York corporation, indicating that Jackson himself transacted any business within the state of New York.

Plaintiff points to the New York choice of law provision in Jackson's NDA as providing the necessary linkage to the forum state.  Compl., at ¶ 15; NDA §§ 1, 13. Although "[a] choice of law clause is a significant factor in a personal jurisdiction analysis because the parties, by so choosing, invoke the benefits and protections of New York law," *Sunward Elecs.*, 362 F.3d at 23, it is not dispositive, *America/Int'l 1994 Venture v. Mau*, 145 A.D.3d 40, 59 (2d Dep't 2016) ("A choice of law provision in an agreement, while relevant, is insufficient by itself to confer personal jurisdiction over a defendant in New York under CPLR 302(a)(1).").  That is particularly the case here, where Jackson's offer of employment from PAR contained a Texas choice of law provision that governed "[t]he validity, interpretation, construction and performance of this [Offer], and all the acts and transactions pursuant hereto and the rights and obligations of [Jackson] and [PAR]," Offer Letter § 6(f), and Delaware law governed Jackson's RSU award agreement with PAR, RSU Award Agreement § 6(g).  The New York choice of law provision in the

NDA governed the construal of the NDA itself — not Jackson's rights and obligations as a PAR employee.  NDA § 13.

Accordingly, the Court finds, based on the present record, that it lacks personal jurisdiction over Jackson under section 302(a)(1).

### 2.    CPLR Section 302(a)(3)

Plaintiff also invokes CPLR section 302(a)(3) as the basis for the Court's exercise of personal jurisdiction over both Defendants.  ECF No. 31 ("Plf. Jan. 9, 2025 Ltr.") at 2.  Under that provision of the long-arm statute, a plaintiff "must allege that (1) the defendant committed a tortious act outside New York; (2) the cause of action arose from that act; (3) the tortious act caused an injury to a person or property in New York; (4) the defendant expected or should reasonably have expected the act to have consequences in New York; and (5) the defendant derived substantial revenue from interstate or international commerce."  CPLR § 302(a)(3); *see also Spin Master Ltd.*, 463 F. Supp. 3d at 365 (quoting *Penguin Grp. (USA) Inc. v. Am. Buddha*, 16 N.Y.3d 295, 302 (2011)) (cleaned up).

Plaintiff easily satisfies the first two prongs of this test.  With respect to Defendant Jackson, Plaintiff's causes of action for breach of contract, misappropriation of trade secrets, violation of the Economic Espionage Act, unfair competition, and unjust enrichment all flow from the allegations regarding Jackson's theft of PAR's confidential information and trade secrets in Texas, including by secretly copying the contents of his PAR laptop and downloading PAR documents to his personal electronic devices.  The Complaint's allegations that Qu

solicited Jackson because of his access to confidential PAR information, and "actively encouraged" Jackson to steal PAR's information for use by Qu, Compl., ¶ 2, likewise set forth the commission of a tortious act. *See Sybron Corp. v. Wetzel*, 46 N.Y.2d 197, 203 (1978) ("If Wetzel possesses trade secrets, however, and if De Dietrich by its hiring agreement with Wetzel intends to obtain them from him, a tortious act will have been committed.").

The more difficult question, however, is whether Plaintiff has sufficiently demonstrated that the tortious act caused an injury to a person or property in New York. PAR concedes that the record does not show that PAR has lost any customers or revenue from the alleged theft of trade secrets. PI Hearing Tr. at 20:12-20; *see also Energy Brands Inc. v. Spiritual Brands, Inc.*, 571 F. Supp. 2d 458, 467 (S.D.N.Y. 2008) ("This [injury caused in New York] element has long been interpreted to include 'harm to a business in the New York market through lost sales or lost customers.'" (quoting *Am. Network, Inc. v. Access Am./Connect Atlanta, Inc.*, 975 F. Supp. 494, 497 (S.D.N.Y. 1997))). Yet Plaintiff is correct that it need not prove that the injury has already occurred. In a case involving a commercial injury such as the misappropriation of trade secrets, all that is required is the reasonable anticipation of a threatened injury based in New York. *Sybron Corp.*, 46 N.Y.2d at 205 (relying upon the "threatened loss of important New York customers" to find personal jurisdiction under section 302(a)(3)). Plaintiff need not wait until its business prospects are potentially destroyed beyond recovery before it may invoke New York's long-arm statute.

Where Plaintiff's arguments founder, however, is in its insistence that, because it is a New York corporation, it can simply be presumed that any harm done to its business is a harm occurring in New York. PI Hearing Tr. at 16:23-17:1 ("Since we have a corporate plaintiff whose place of corporation and princip[al] place of business is New York, that's where that harm occurs. Where else could it occur?"). Courts have repeatedly rejected this proposition. Instead, the relevant inquiry is the "situs-of-injury" test, which considers where the "original event" that caused an injury in New York occurred. *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 791 (2d Cir. 1999) (quoting *Hermann v. Sharon Hosp., Inc.*, 135 A.D.2d 682, 683 (2d Dep't 1987)). In cases involving commercial injuries, the Court scrutinizes the "location of the original event which caused the injury, not the location where the resultant damages are subsequently felt by the plaintiff[,] . . . [and] the situs of a nonphysical, commercial injury is where the critical events associated with the dispute took place." *Symmetra Pty Ltd. v. Human Facets, LLC*, No. 12-CV-8857 (SAS), 2013 WL 2896876, at *5 (S.D.N.Y. June 13, 2013).

The mere fact that a plaintiff is domiciled in New York does not, standing alone, establish that they will experience a threatened loss of business in New York that warrants jurisdiction. *See, e.g.*, *Whitaker v. Am. Telecasting, Inc.*, 261 F.3d 196, 209 (2d Cir. 2001) ("The occurrence of financial consequences in New York due to the fortuitous location of plaintiffs in New York is not a sufficient basis for jurisdiction under § 302(a)(3) where the underlying events took place outside New York."); *Lehigh Val. Indus., Inc. v. Birenbaum*, 527 F.2d 87, 94 (2d Cir. 1975) ("We

have held that section 302(a)(3) is not satisfied by remote or consequential injuries such as lost commercial profits which occur in New York only because the plaintiff is domiciled or doing business here."); *V Cars, LLC v. Israel Corp.*, 902 F. Supp. 2d 349, 367 (S.D.N.Y. 2012) ("It has, however, long been held that the residence or domicile of the injured party within [New York] State is not a sufficient predicate for jurisdiction [under CPLR § 302], which must be based upon a more direct injury within the State and a closer expectation of consequences within the State than the indirect financial loss resulting from the fact that the injured person resides or is domiciled there.") (quoting *Fantis Foods, Inc. v. Standard Importing, Co.*, 49 N.Y.2d 317, 326 (1980)).

Accordingly, this Court's jurisdiction over Jackson and Qu turns on whether either Defendant's acts have caused a direct harm to PAR in New York, such as by threatening a loss of customers based in New York or profits stemming from operations in New York. The Court concludes that the record does not support such a finding.

Although Plaintiff relies heavily on the New York Court of Appeal's decision in *Sybron Corp.*, *see* Plf. Jan. 9, 2025 Ltr., that decision is unavailing. In *Sybron Corp.*, the New York Court of Appeals found personal jurisdiction under section 302(a)(3) where the trade secrets in question had been stolen in New York, and the defendant had actively solicited business from an important New York-based customer. 46 N.Y.2d at 205. The New York Court of Appeals declined to decide "whether the loss of a small New York account" would suffice to show direct

economic injury in New York, as the plaintiff had adequately demonstrated that it was threatened with the loss of a "major" New York customer such that its "New York sales could suffer significantly." *Id.*

Despite being offered the opportunity to supplement the record with additional declarations, Plaintiff has failed to adduce any evidence indicating that there is a reasonable probability that it will suffer a direct injury to its business prospects in the New York market, let alone the scale of such injury. "[A] plaintiff must allege specific facts establishing the anticipated commercial harm and identifying the threatened future customers; speculative or conclusory allegations will not suffice." *Am. Integrated Sec. Grp., Inc. v. Terra Sound Tech. LLC*, No. 22-CV-2773 (AMD) (MMH), 2023 WL 6308014, at *5 (E.D.N.Y. Sept. 28, 2023). Plaintiff has offered no evidence regarding any of its existing or prospective New York based clients, the size of such accounts, the effect the loss of such accounts would have on PAR's business, or the possibility that such accounts have been or will be targeted by Qu.[1] In the absence of such evidence, the Court cannot find that Plaintiff has a reasonable probability of success on the question of personal jurisdiction.

Plaintiff has adduced evidence that the industry for point-of-sale service developers, especially those focused on serving large enterprise restaurant

---

[1] Although Plaintiff's unsworn letter briefs mention a few potential clients by name, ECF Nos. 31 & 33, they notably fail to provide any details regarding those companies, including whether they are headquartered in New York or have sites in New York, or the size and nature of the potential accounts.

customers, is small, Ostertag Affirm., ¶¶ 3-6, and PAR and Qu therefore compete for a limited number of service contracts, *id.* ¶ 6. Yet nothing in the declarations submitted indicates that any of those narrow group of current or prospective customers are based *in New York.* Instead, the evidence is that these customers are large regional or national chains, with numerous sites throughout North America.[2]

Plaintiff points to *Symmetra Pty Ltd.* and *Am. Integrated Sec. Grp.* as support for its position, but if anything, both cases serve to highlight the dearth of allegations in this record specific to New York. In *Symmetra*, the defendants had run a smear campaign that was connected to its business activities in New York, with the defendants going so far as to "attend[] New York marketing events with [plaintiff], and use[] proprietary information derived from these events to hamper [plaintiff's] business activities in New York." 2013 WL 2896876, at *9. Plaintiff's allegations here do not establish any acts by Defendants that would suggest clear targeting of PAR's customers in New York.

In *Am. Integrated*, the allegations are analogous to those in the instant case, in that an employee had purloined confidential and proprietary information from his old employer and, shortly thereafter, joined a direct competitor. That is where the similarity ends, however. The *Am. Integrated* Court found jurisdiction based on

---

[2] The parties do not appear to dispute that some of PAR and Qu's existing customers have retail locations in New York, as would be expected from national chains. The parties have not addressed, and the Court need not determine today, whether the threatened loss of a client headquartered and domiciled outside of New York causes a direct economic injury to Plaintiff in New York if that client operates retail locations within the New York market.

allegations that the defendants had used the misappropriated trade secrets to lure away a specific customer that had offered the plaintiff significant prospective business opportunities in New York.  2023 WL 6308014, at *6.  The Court also noted that the defendants had allegedly "communicated for 'months' to 'devise a plan' to abscond with [plaintiff's] confidential and proprietary information" by targeting a New York employee.  *Id.*

Accordingly, the Court finds the current record insufficient to support the Court's exercise of personal jurisdiction over either Defendant under section 302(a)(3).[3]

## B.    Preliminary Injunction

In light of its conclusion regarding personal jurisdiction, the Court need not decide whether Plaintiff has otherwise satisfied the requirements of Rule 65.  The Court nonetheless provides the following observations, in the event that Plaintiff elects to renew its motion on a more fully developed record on personal jurisdiction.

Injunctive relief "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion."  *Sussman v. Crawford*, 488 F.3d 136, 139 (2d Cir. 2007) (per curiam) (cleaned up).  In considering an application for preliminary injunction, the Court must evaluate the plaintiff's showing for "(1) a likelihood of success on the merits," (2) "that [the plaintiff] is likely to suffer irreparable injury in the absence of an

---

[3] Although this opinion does not reach the remaining prongs of the section 302(a)(3) test, the Court notes that neither party has addressed whether Jackson derived substantial revenue from interstate or international commerce.

injunction," (3) that "the balance of hardships tips in the plaintiff's favor," and (4)
"that the public interest would not be disserved by the issuance of [the] injunction."
*Salinger v. Colting*, 607 F.3d 68, 79–80 (2d Cir. 2010) (quotation marks and
citations omitted).

In particular, "[a] showing of irreparable harm is the single most important
prerequisite for the issuance of a preliminary injunction." *Faiveley Transp. Malmo
AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (quotation marks and citations
omitted). "To satisfy the irreparable harm requirement, [p]laintiffs must
demonstrate that absent a preliminary injunction they will suffer an injury that is
neither remote nor speculative, but actual and imminent, and one that cannot be
remedied if a court waits until the end of trial to resolve the harm." *Id.* (quoting
*Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007)). The
"mere possibility of irreparable harm is insufficient to justify the drastic remedy of a
preliminary injunction." *Borey v. Nat'l Union Fire Ins. Co.*, 934 F.2d 30, 34 (2d Cir.
1991). If irreparable harm is established, *Faiveley* instructs that a "narrowly
drawn" preliminary injunction should focus on "protect[ing] the trade secrets from
further disclosure." 559 F.3d at 119.

The Second Circuit has clearly specified that irreparable harm cannot simply
be presumed in cases involving the misappropriation of a trade secret, as
commercial harms resulting from the misappropriation often can be remedied
through monetary damages. *Id.* at 118. In *Faiveley*, the Second Circuit contrasted
the types of widespread damage to a business that could result, for example, from

21

the indiscriminate release of confidential information, with a situation in which the misappropriator "seeks only to use those secrets — without further dissemination or irreparable impairment of value — in pursuit of profit." *Id.* In the latter scenario, the Second Circuit opined, the competitor is incentivized to maintain the confidentiality of the stolen information, such that "an award of damages will often provide a complete remedy for such injury." *Id.* at 118.

Thus, it is imperative for the movant seeking injunctive relief to demonstrate that there is a threat that the stolen trade secrets would be used in such a way that any harm could not be remedied through money damages. *See id.* ("Where there is an adequate remedy at law, such as an award of money damages, injunctions are unavailable."); *ExpertConnect, LLC v. Fowler*, No. 18-CV-4828 (LGS), 2020 WL 57518, at *2 (S.D.N.Y. Jan. 6, 2020) (noting that reputational harm cannot be compensated by money damages alone).

This standard could potentially be met by evidence of an actual or imminent threat to use the trade secrets to cause "harm in unquantifiable ways" for the plaintiff to compete. *International Business Machines Corp. v. Papermaster*, No. 08-CV-9078 (KMK), 2008 WL 4974508, at *9 (S.D.N.Y. Nov. 21, 2008). Moreover, "[a]s the Second Circuit explained, it is very difficult to calculate monetary damages that would successfully redress the loss of a relationship with a client that would produce an indeterminate amount of business in years to come." *Global Switching Inc. v. Kasper*, No. CV-06412 (CPS), 2006 WL 1800001, at *3 (E.D.N.Y. June 28, 2006) (citation and quotation marks omitted). Indeed, the "loss of business

opportunities and relationships with clients who could produce an indeterminate amount of business over years to come are also hard to measure in dollars and are properly considered irreparable harm." *IME Watchdog, Inc. v. Gelardi*, 732 F. Supp. 3d 224, 241 (E.D.N.Y. 2024). Furthermore, the industry's characteristics are also a significant factor for consideration as the industry's size may mean that the dissemination of trade secrets could cripple the plaintiff's business. *See id.* ("[The] market is relatively small and finite, such that finding new customers to replace the ones poached by Defendants has not and will not be easy for Plaintiff.").

Nonetheless, nothing in the current record establishes that Qu is planning to "disseminate [the trade] secrets to a wider audience or otherwise irreparably impair the value of those secrets." *Faiveley*, 559 F.3d at 118. To the contrary, it appears that both Defendants have taken measures to safeguard PAR's proprietary information since this suit was filed. Qu placed Jackson on administrative leave and suspended his access to Qu's systems. ECF No. 34 at 6-7; Jackson Dep. at 71:16-72:3. Defendants have also represented that the electronic devices in question have been turned over to a third party vendor while the parties negotiate a protocol to identify, segregate and remove PAR's confidential information. PI Hearing Tr. at 4:9-8:7; *see also* Jackson Decl., ¶¶ 9-12; Defs. Obj., Exs. A & B. Absent some evidence that Qu or Jackson nonetheless have access to the stolen trade secrets and have an intent to disseminate or use those trade secrets in such a way as to cause irreparable harm to PAR, Plaintiff would not be entitled to a preliminary injunction. *Am. Airlines, Inc. v. Imhof*, 620 F. Supp. 574, 580

(S.D.N.Y. 2009) (finding the threat of irreparable injury neutralized when the alleged misappropriator offered to return or destroy all copies of proprietary and confidential information as there was "no material risk that [defendant] will retain copies of the documents, much less . . . disclose them").

**CONCLUSION**

For the foregoing reasons, Plaintiff's Application is DENIED, without prejudice to renew upon an adequate showing of personal jurisdiction. Plaintiff is granted leave to file amended pleadings within fifteen days, on or before **February 13, 2025**. The temporary restraining order granted by the Court's December 10, 2023 Order to Show Cause (ECF No. 14) is deemed immediately dissolved.

SO ORDERED.

Dated:  January 29, 2025
      New York, New York

JEANNETTE A. VARGAS
United States District Judge